IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:11-CR-6 |
| | ) | |
| DANIEL D. GIBSON, | ) | (VARLAN/SHIRLEY) |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Gibson's Motion to Suppress Statements by the Defendant [Doc. 45], filed on April 13, 2011. The Government responded [Doc. 60] in opposition to the motion on May 31, 2011. The Court held an evidentiary hearing on June 20, 2011. Assistant United States Attorneys Kelly A. Norris and Zachary C. Bolitho represented the Government. Attorney Christopher J. Oldham appeared on behalf of the Defendant, who was also present. The Government presented the testimony of Knoxville Police Department (KPD) Officer Phillip Jinks from the Repeat Offenders Squad. The Defendant presented the testimony of Jeremiah Varner, Ashley Nelson, and Defendant Gibson. The parties also presented oral argument on the issues. At the conclusion of the hearing, the Court took the motion, response, testimony, exhibits, and oral arguments under advisement.

## I. POSITIONS OF THE PARTIES

The Defendant is charged in a thirteen-count Superseding Indictment [Doc. 2] with conspiring with Defendants DeWyatt A. Hill, Donald G. Hopson, Jr., Mortan Dean Moore, and James Lee Marable (charged in a separate Information) to obtain controlled substances by robbing pharmacies and to acquire large sums of cash through the sale of stolen controlled substances between the approximate dates of September 14, 2010, to December 17, 2010 (Counts One, Two, Four, Six, Eight, and Ten). The Defendant is also charged with brandishing a firearm during a crime of violence (Counts Three, Five, Seven, Nine, and Eleven) and being a felon in possession of a firearm (Counts Twelve and Thirteen). The Defendant argues that the statement he gave to Officer Jinks while in custody on December 23, 2010, should be suppressed because he was impaired and unable to make a knowing and voluntary waiver of his Miranda rights. He contends that he has an addiction to narcotics and that at the time of the statement, he was under the influence of roxicodone. He maintains that due to his impairment, he could not rationally or knowingly waive his Fifth Amendment rights.

The Government responds that the Defendant knowingly and voluntarily waived his rights at the start of his interview and that his statement was not the product of police coercion. It further asserts that the detailed and accurate answers provided by the Defendant at the start of the interview show that any voluntary consumption of narcotics by the Defendant failed to have a sufficient effect on his mental state so as render the waiver of his Miranda rights involuntary.

## II. SUMMARY OF EVIDENCE FROM SUPPRESSION HEARING

*(A) Testimony of Officer Phillip Jinks*

The Government called Officer Phillip Jinks, who testified that he works for the KPD as an officer in the Repeat Offenders Squad, primarily investigating crimes related to controlled substances. Officer Jinks investigated a string of armed robberies in Knoxville during the fall of 2010, and that investigation led to the arrest of the Defendant on December 23, 2010. Officer Jinks testified that the Defendant was arrested after a vehicle pursuit and a foot chase and was taken to the Repeat Offenders Squad office in the KPD Headquarters. Officer Jinks, along with Lt. Mark Webber of the Knox County Sheriff's Office, interviewed the Defendant, and the interview was video recorded, beginning at 5:36 p.m. on December 23, 2010.

On the video recording [Exhibit 2], Officer Jinks asks the Defendant several preliminary personal questions, including his name, phone number, date of birth, place of birth, social security number, address, height, weight, eye color, and the name of his wife. The Defendant answered each of those routine booking questions correctly and without difficulty. The Defendant then admitted that his rights had been read to him before. Next, Officer Jinks advised the Defendant of his Miranda rights both orally and in printed form. Officer Jinks read each right aloud separately to the Defendant and verified that the Defendant understood each right after he read it. The Defendant answered in the affirmative that he understood each of the rights as they were read.

Officer Jinks then asked the Defendant to sign the Miranda Rights/Waiver Form. The Defendant expressed that he was scared about what might happen because he knew that he had a "violation," but did not believe that his arrest could have only been about a violation because he had violated before and the police had never gone to as much trouble. He expressed that he was unsure

3

if he should talk to Officer Jinks because he did not know the whole reason behind his arrest. After this discussion went on for a short time, Officer Jinks suggested to the Defendant that he could sign the waiver form and begin a conversation and then stop answering questions or talking at anytime he wanted to. After a pause, the Defendant stated, "I'll talk." Upon request, Officer Jinks loosened the Defendant's handcuffs for him.

At the hearing, Officer Jinks testified that he asked routine booking questions at the beginning both to obtain the necessary biographical information provided as the answers to the questions and to gauge the ability of the suspect to answer questions and conduct a conversation. The Defendant did not slur his speech during those answers and did not smell of alcohol or marijuana. Officer Jinks did not specifically ask the Defendant if he was intoxicated because he saw no indication that he was. The Defendant did not express confusion except as to the reason for his arrest. He expressed no confusion about his current location or the nature of his rights. The Defendant informed Officer Jinks that he woke up around 10:00 a.m. on the day of his arrest.

Officer Jinks identified the Miranda Rights/Waiver Form [Exhibit 3] signed by the Defendant. Officer Jinks stated that the Defendant at no time requested an attorney, asked to stop the interrogation, or invoked his right to remain silent. At the end of the interrogation, the Defendant wrote a handwritten letter of apology to the victims. Officer Jinks testified that the Defendant had no difficulty writing or wording the letter at that time.

On cross-examination, Officer Jinks testified that he was not present at the initial pursuit and arrest of the Defendant, but that he later searched the Defendant's vehicle. As a result of that search, Officer Jinks discovered marijuana and various prescription pills, specifically oxycodone and morphine. Officer Jinks stated that the pills in the vehicle were packaged in bags and labeled with

4

prices, apparently for resale. Some of the marijuana present was packaged as such, while some appeared to be packaged for personal use. Officer Jinks testified that the Defendant informed him during interrogation that he was addicted to painkillers. Officer Jinks also testified that the same painkillers to which the Defendant claimed to be addicted were what was stolen in the pharmacy robberies. The Defendant's brother, Jeremiah Varner, and the Defendant's girlfriend, Ashley Nelson, each informed Officer Jinks that the Defendant was a user of pain pills and that he also sold them.

Officer Jinks further testified that he did not ask the Defendant if he was impaired at the time of the interrogation because he did not detect that the Defendant was in any way impaired. Officer Jinks did not remain in the interview room with the Defendant for the full duration of the Defendant's time in the room, but he did observe the Defendant from outside of the room when he left it. Officer Jinks observed the Defendant trying to get to sleep, moving to the floor, putting two chairs together to lay on, and covering his head with the hood of his sweatshirt.

Officer Jinks stated that the Defendant discussed only three of the five robberies in which he was involved during the interrogation. One of the robberies, discussed by the Defendant, was of a CVS Pharmacy (CVS) located on Alcoa Highway. Officer Jinks testified that the Defendant indicated during the interrogation that the CVS was located in Maryville, Tennessee, rather than its true location in Knoxville. The Defendant was then able to describe the CVS as being near a Hardee's and further correctly describe its location. Officer Jinks believed that the reason that the Defendant fairly openly implicated himself in three robberies, rather than the full five in which he was involved, was that the three robberies he discussed were the ones that only Defendant Gibson and Defendant Hill are charged with participating in. Officer Jinks testified that he believed that the

5

Defendant was attempting to protect the other defendants by not discussing the robberies in which they participated.

On redirect examination, Officer Jinks stated that he commonly interviews drug users and that a suspect's status as a drug user does not render him unable to comprehend what is going on around him. Officer Jinks also stated that he is familiar with the term "functioning drug user" and that people who fit into that category have built up a tolerance to the drugs they take. Officer Jinks testified that, at the time of his arrest, the Defendant had been driving a Mustang that was struck by a police car. The Defendant then exited his Mustang and got into another car in the area. The police officers in pursuit fired shots to stop the car the Defendant was in at that point. The Defendant then exited again and fled on foot. He was apprehended after approximately an hour-long search. The Defendant and Lt. Webber discussed during the interrogation that they were both tired from having run around earlier in the day during the pursuit.

Officer Jinks also testified that Alcoa Highway is the main thoroughfare to get from Knoxville to Maryville and that the CVS, which was robbed on Alcoa Highway, is located only two to three miles from the dividing line between the cities of Knoxville and Maryville, which is often difficult to determine. Office Jinks admitted that although the Defendant was able to tell some details about the three robberies he discussed during the interrogation, he was also vague in his descriptions. Officer Jinks testified that the Defendant never became incoherent during the duration of the interview.

On re-cross-examination, Officer Jinks agreed that drug and alcohol use by "functioning drug users" does impair their judgment.

6

### (B) Testimony of Ashley Nelson

The Defendant presented the testimony of Ashley Nelson. Ms. Nelson is the Defendant's girlfriend[1] and testified that she has known the Defendant for a little over two years. She testified that the Defendant is a user of roxicodone. She was not present when the Defendant was arrested, but they spent the night together the night of December 22, 2010, and Ms. Nelson observed the Defendant using "roxy thirties" on the morning of his arrest. Ms. Nelson testified that while the Defendant usually took her daughters to school, she believed that the Defendant was too "messed up" to take them that morning, and she did not allow him to do so.

On cross-examination, Ms. Nelson clarified that she believed that the Defendant had taken two roxy thirties at around 8:30 a.m., on the morning of December 23, 2010, and she did not know if he had gone back to sleep after she left. She took her daughters to school, and she never saw the Defendant again that day, so she did not know if he took more pills as the day went on. Ms. Nelson stated that the Defendant got his roxicodone pills from "different places" and that he took around ten to twelve pills each day. She admitted that the Defendant drove on a regular basis and that she had conversations with him "when she could." She admitted that he was able to live a normal life. The Defendant told Ms. Nelson that he had robbed a few places after he had done so, but she did not inform the police because she loved him, and the robberies had nothing to do with her.

On redirect examination, Ms. Nelson stated that she answered all questions posed by the police about the robberies, when they contacted her.

---

[1]There is some confusion about the relationship status of the Defendant and Ashley Nelson. The Government's response [Doc. 60] and the Defendant's statements made during the initial booking questions present Ms. Nelson as the Defendant's wife, with a maiden name of Cooper. Ms. Nelson's own testimony was that she was the girlfriend of the Defendant.

### (C) Testimony of Jeremiah A. Varner

The Defendant next presented the testimony of Jeremiah A. Varner. Mr. Varner is the Defendant's brother and was seventeen years old on the date of the hearing. He was aware that the Defendant used pills but did not know the extent to which the Defendant used. Mr. Varner was with the Defendant on the morning of his arrest because he had run away from home and spent the preceding night at the Defendant's residence. At around 10:30 or 11:00 a.m., on the morning of December 23, 2010, Mr. Varner observed the Defendant using five or six "roxy thirties." Mr. Varner testified that this occurrence was shortly before the Defendant first encountered the police officers that day. Mr. Varner observed that the Defendant was not fully in control of his mind because of the effects of the pills, and this was evidenced by the Defendant stumbling some when he walked. Mr. Varner stated that nothing other than the stumbling exhibited the Defendant's altered mental state.

On cross-examination, Mr. Varner stated that he had not been around the Defendant much prior to the date of the Defendant's arrest because Mr. Varner lived in Seymour, Tennessee, and his parents did not allow the Defendant to come around much. The Defendant took the pills on the morning of his arrest by crushing up and snorting each one in succession. After they dressed for the day, Mr. Varner got into the vehicle, with the Defendant behind the wheel, to go to someone's house. Mr. Varner stated that the Defendant was "messed up" at the time, but that it did not seem like it was to the point that the Defendant could not drive. He stated that they did not talk to each other much that morning or during their drive. Mr. Varner admitted that he should not have ridden in the car with the Defendant at that point but stated that he did so because the Defendant is his brother.

### (D) Testimony of Daniel D. Gibson

Lastly, the Defendant testified on his own behalf, stating that he has a drug use problem and that prior to his arrest he used roxicodone, oxycodone, and marijuana. He took approximately fifteen to twenty "roxy thirties" per day. The pills "mellowed him out" and made the day go by like it "wasn't even there." The Defendant testified that he felt as though he was not in control of himself when he took the drugs and that the feeling was the point of using the pills.

The Defendant recalls "bits and pieces" of December 23, 2010. He took a couple of pills in the morning and then took more throughout the day. He took three roxicodone pills when he woke up like he usually did as his "morning medicine" to get him going for the day. The Defendant testified that the majority of the pills that Officer Jinks found in his vehicle were for personal consumption. He does not remember getting into his vehicle when he and Mr. Varner left his house that morning. The Defendant testified that he used a one hundred dollar bill from his wallet to snort the last four roxicodone pills that he had on his person while he was hiding from the police after the car chase.

The Defendant testified that he does not remember being transported to the police station after his arrest, but that he thought he remembered a camera lady. The Defendant recalls Officer Jinks laying a picture of his family on the table and telling him that his brother and family were there. The Defendant testified that Officer Jinks told him that he needed to talk if he ever wanted to be out with them again. The Defendant remembered signing the Miranda Rights/Waiver Form and remembered parts of the interrogation. He stated that he wanted to rest or sleep the whole time, but that the officers kept questioning him. The Defendant remembered having a conversation about the robberies but did not believe that he was present for the West Knoxville and Bristol robberies, which

9

is why he did not discuss them with Officer Jinks at that time. The Defendant testified that he would now do things from that day differently if he could.

On cross-examination, the Defendant reiterated that he took three roxicodone pills on the morning of his arrest like he did every morning, and he stated that he had been following that routine for approximately two to three months leading up to December 23, 2010. The Defendant admitted that, during the period of his heightened pill addiction, he was able to perform many normal activities, including driving and ordering food at restaurants. He stated that he was not always able to perform daily tasks though.

The Defendant admitted that he gave the correct answers to his name, date of birth, social security number, wife's name, cell phone number, and address in response to the routine booking questions asked by Officer Jinks after his arrest. The Defendant knew that he was at a police station during that time. He was confused as to why he was there because he thought he was arrested for a violation, but he knew that he had been arrested and that he had been asked to waive his rights. The Defendant stated that he had been advised of those rights before, so he knew them and understood the meaning of each one. The Defendant understood what waiving his rights meant and was not confused at the time he waived the rights. The Defendant testified that he understood his Miranda rights when he signed the waiver form, but that he was in the interview room for hours, and he believes some of the pills he took earlier started to affect him after he signed the waiver because he only remembers bits and pieces of the interview. The Defendant admitted that he was given water and a hamburger "if it is on the video" because he did not remember whether or not it occurred.

10

## III. FINDINGS OF FACT

The Court finds the following facts to be relevant in addressing the issues presented: The Defendant was arrested on December 23, 2010. The Defendant took between three and six 30 milligram roxicodone pills before he left his house at around 11:00 a.m. The Defendant was pursued by police, eventually fleeing into a wooded area. The Defendant testified that he snorted four roxicodone pills during the foot chase.[2] The Defendant was arrested and was transported to KPD headquarters. The Defendant was placed in an interview room at 2:49 p.m. The video recording of the Defendant's statement reflects that Officer Jinks and Lt. Webber's interrogation of the Defendant began at 5:36 p.m.

After asking a series of biographical questions, Officer Jinks read the Defendant his Miranda rights and asked him if he understood each of them. The Defendant indicated that he did, and after some hesitation, he stated, "I'll talk," and signed and dated a Miranda waiver form. After denying any involvement in the robberies for over an hour, the Defendant admitted participation in three robberies. Officer Jinks, Lt. Webber, and the Defendant went on to discuss three of the five robberies with which the Defendant is charged. While the information given by the Defendant was at times vague and reluctantly given, he appeared lucid and coherent throughout the interrogation. The Defendant finished drafting a letter of apology to the robbery victims at approximately 11:48 p.m., and the video recording ended with the Defendant lying on the floor after questioning had ended at 11:49 p.m.

---

[2]The Court notes that while there is no testimony to contradict the Defendant's account of this fact, it remains skeptical of this self-serving account. Nonetheless, for the purposes of the following analysis, the Court accepts the Defendant's testimony in determining the voluntariness of his statement.

## IV. ANALYSIS

The Defendant argues that he could not knowingly, intelligently, and voluntarily waive his rights under the Fifth Amendment to the United States Constitution, contending that he was under the influence of roxicodone and impaired when he gave his statement to Officer Jinks on December 23, 2010. The Government contends that the Defendant was advised of his Miranda rights and knowingly and voluntarily waived them in writing. It maintains that any roxicodone he took prior to his confession did not cause him to be impaired to the extent that the impairment rendered his confession involuntary.

The Fifth Amendment to the United States Constitution protects against a defendant being "compelled in any criminal case to be a witness against himself." U.S. Const. amend IV. In light of this protection, the Supreme Court of the United States has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). Thus, before law enforcement officials may question a suspect in custody, the officials must inform the suspect that he has a right to remain silent, that his statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to questioning. Miranda, 384 U.S. at 479. "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

Even when the Miranda warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those Miranda rights before it may

12

introduce an incriminating statement by a defendant. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. Id. at 168. To determine whether a confession was voluntary, the court must examine the following factors in light of totality of the circumstances: (1) whether the police conduct was objectively coercive, (2) whether the coercive police conduct was sufficient to overbear the defendant's will when viewed subjectively from the defendant's state of mind, and (3) whether the coercive police conduct was in fact the cause of the defendant's will being overborne. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988). Circumstances relevant to whether the Defendant's will was overborne "include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

*(A) Police Coercion*

The first step in analyzing whether the Defendant's statement was voluntary is determining whether any police coercion occurred. Connelly, 479 U.S. at 167, McCall, 863 F.2d at 459. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167. "If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed." McCall, 863 F.2d at 459 (citing Connelly, 479 U.S. at 163-64).

13

In the present case, the Court finds that the Defendant has failed to prove that the conduct of the law enforcement officers was objectively coercive. Aside from asserting that the police officers failed to sufficiently inquire as to whether the Defendant was not under the influence of pills prior to the start of the interrogation, the Defendant asserts no specific coercive conduct of the officers. The Court notes that the interrogation took place while the Defendant was in law enforcement custody at the KPD headquarters and that he wore handcuffs for a portion of the interview. Although the Defendant was in an inherently coercive setting, there is no evidence that the officers attempted to intimidate the Defendant. On the contrary, the atmosphere and tone of the officers was cordial and respectful. Officer Jinks provided the Defendant with water and a hamburger throughout the evening. Neither Officer Jinks, nor Lt. Webber, ever physically abused the Defendant, and they instead made efforts to make the Defendant comfortable. Officer Jinks first loosened the Defendant's handcuffs and then removed them altogether later in the evening. Officer Jinks also adjusted the thermostat to change the temperature in the interview room when the Defendant informed him that he was hot and instructed the Defendant to let him know if he wanted a further temperature adjustment.

As to the length of the interrogation, while the Defendant remained in the interview room for approximately nine hours, the timing of the interview did not make it coercive in this case. Unlike interrogations that continue overnight when a defendant may usually be sleeping, the interrogation of the Defendant began at 5:36 p.m. and ended prior to midnight. While Officer Jinks admitted that the Defendant appeared to be trying to get to sleep at points over the period of the interrogation, the Court notes that the Defendant's attempts to sleep were while waiting for the officers to return and occurred mostly toward the end of the interrogation, at nearly 10:00 p.m. and

after. No statements made by the Defendant indicated that he was too sleep-deprived to understand the nature of the conversation or comprehend his rights.

After review of the video recording, the Court notes that Officer Jinks at one point raised his voice and, as the Defendant testified, instructed him to look at a picture of his family and start talking in order to obtain leniency from the prosecutors and see his children grow up. However, the Court does not find that this isolated instance of conduct rises to the level set forth in cases where police conduct of this type has been found to be coercive. See Ledbetter v. Edwards, 35 F.3d 1062, 1067-70 (6th Cir. 1994) (stating that "not all psychological tactics are unconstitutional" and finding the officers' presentation of the adverse consequences of being convicted of the crime insufficient to render a confession involuntary in violation of Miranda). Illusory "promises of leniency, coupled with threats of immediate imprisonment," may overbear a defendant's will. Williams v. Withrow, 944 F.2d 284, 289 (6th Cir. 1991), aff'd in part and rev'd in part, 507 U.S. 680 (1993). In this case, however, Officer Jinks instructed the Defendant that he could not make any promises regarding the Defendant's sentence because he was not a judge and that all he could do was pass the message that the Defendant cooperated to the prosecutor's office. The totality of the circumstances shows no coercive police activity in this case.

*(B) Characteristics of Defendant*

To assess whether a confession was voluntary, the Court must "examine 'the totality of the circumstances surrounding the confession, both the characteristics of the accused and the details of the interrogation, and determine[ ] their psychological impact on an accused's ability to resist pressures to confess.'" United States v. Rigsby, 943 F.2d 631, 635 (6th Cir. 1991) (quoting United

15

States v. Brown, 557 F.2d 541, 546 (6th Cir.1977)). In addition to finding no police coercion in this case, the Court finds that the characteristics of the Defendant on the date of his arrest and time of his interrogation indicate that he made a knowing and voluntary waiver of his Miranda rights.

A defendant knowingly waives his or her Miranda rights if the Miranda waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Berghuis v. Thompkins, 130 S.Ct. 2250, 2260 (2010) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The relevant question is not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or discontinue talking at any time.'" Garner v. Mitchell, 557 F.3d 257, 261 (6th Cir. 2009) (en banc) (holding that habeas relief was improper and that the prisoner knowingly and voluntarily waived his Miranda rights when a test administered six years later showed that he suffered from diminished mental capacity) (quoting Colorado v. Spring, 479 U.S. 564, 574 (1987)).

Here, the Defendant was given the Miranda warnings both orally and in written form. The Defendant admitted both at the time of the interrogation on December 23, 2010, and at the suppression hearing on June 20, 2011, that he had been read his Miranda rights before that day and that he understood them. Additionally, as in Garner, Officer Jinks read each Miranda right separately and asked the Defendant whether he understood that right individually. See Garner, 557 F.3d at 261. The Defendant signed and dated the Miranda waiver form and wrote an apology letter to the victims of the robberies without difficulty writing. The Defendant's experience with the criminal justice system, together with his express assertions both at the time of waiver and during his testimony on

16

June 20, indicate that he knowingly and voluntarily waived his Miranda rights.

Further, although the Defendant claims to have been under the influence of roxicodone, this alone does not render his confession involuntary: "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." United States v. Newman, 889 F.2d 88, 94 (6th Cir. 1989); see also United States v. Dunn, 2008 WL 698940, at *4 (6th Cir. Mar. 17, 2008) (holding that defendant's assertion that he was under the influence of Vicodin and marijuana when he waived his rights did not render his statement involuntary in the absence of police coercion). As stated above, here, the Court finds no evidence of coercion on the part of the officers.

Moreover, the testimony at the suppression hearing revealed that the Defendant's consumption of roxicodone did not affect his ability to work, drive, or conduct normal daily activities. The Defendant testified that he took three "roxy thirties" on the morning of December 23, 2010, but he also stated that he took this amount of pills every day for the several months leading up to his arrest as his "morning medicine." Other than the Defendant's own statement to the contrary, there is no indication that the Defendant had great difficulty functioning in his daily life while under the influence of roxicodone prior to his arrest. While Ms. Nelson testified that the Defendant was too "messed up" to drive her daughters on the morning of his arrest, the time that she testified as to having seen him take two roxicodone pills was nearly nine hours before the start of the interrogation and his signing of the waiver form. Likewise, while Mr. Varner testified to seeing the Defendant snort five or six roxicodone pills prior to leaving the house in the late morning, he stated that the Defendant was able to drive a car.

17

Officer Jinks' testimony about the Defendant's demeanor and conduct, as well as the video recording clip of the beginning of the interrogation, additionally belie the Defendant's contention that he was confused and unaware of what he was doing. The Defendant appeared to be rational and cognizant of the situation and his actions. While Officer Jinks admitted that he failed to inquire as to any intoxication at the time of the interview, he testified that he chose not to do so because he has experience interviewing impaired suspects and the Defendant did not exhibit any signs of impairment. The Defendant was able to correctly answer each of the routine booking questions before the start of the interview, including requests for his social security number, address, and telephone number. While the Court notes the Defendant's argument that the answers to routine booking questions come from rote memory, the Defendant never expressed confusion as to his rights or his whereabouts, and he paused to think before agreeing to waive his rights and conduct a conversation with Officer Jinks.

Lastly, the Defendant summarily argues that some of the roxicodone pills that he snorted just prior to his arrest may not have taken effect yet when he signed the waiver form, but he suggests that they did so at some point during the interrogation, rendering statements he made after that point involuntary. This is the Defendant's explanation for why his statements should be suppressed, even though he fully understood his rights when he waived them. The Defendant fails to point to any point in the interview at which he claims he became impaired. Nor did the Defendant provide any medical or expert evidence regarding the effect, if any, of the earlier alleged ingestion of roxicodone on the Defendant and his voluntariness, or on his ability to understand what he was doing in giving the statement. Moreover, the Court has reviewed the video recording, and it also indicates that the Defendant appeared rational, coherent, lucid, and capable of understanding questions asked and

18

answering them.  It does not appear that the Defendant's free will was overborne by any ingestion of drugs or police coercion.  The Court finds no evidence to support the Defendant's assertion and finds it to be without merit.

In sum, the Court finds that the Defendant was properly advised of his <u>Miranda</u> rights, including his right not to make any statements under the Fifth Amendment.  The Defendant made a knowing, intelligent, and voluntary waiver of his rights and, thereafter, made an incriminating statement to Officer Jinks.  Officer Jinks in no way coerced the statement.  Accordingly, despite the Defendant's contentions to the contrary, the Court finds that the Government has demonstrated that the Defendant's statement was properly obtained, and was knowing and voluntary.  The Court recommends that the Defendant's motion be denied.

## V. CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds no basis to suppress the Defendant's statement. For the reasons set forth herein, it is **RECOMMENDED** that the Motion to Suppress Statements by the Defendant [**Doc. 45**] be **DENIED**.[3]

                                      Respectfully submitted,

                                      s/ C. Clifford Shirley, Jr.
                                      United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).